# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | |
|---|---|
| GLENVILLE SHELL, LLC, individually and on behalf of a class of all others similarly situated, | Case No. 2:14-CV-02306-DDC-KMH |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FERRELLGAS, L.P.; FERRELLGAS PARTNERS, L.P.; AMERIGAS PROPANE, INC.; AMERIGAS PROPANE, L.P.; AMERIGAS PARTNERS, L.P.; UGI CORPORATION; and Ken Janish, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Glenville Shell LLC, on behalf of itself and all others similarly situated, alleges as follows:

### I.   PRELIMINARY STATEMENT

1.      The two largest distributors of propane exchange tanks, Ferrellgas Partners, L.P and Ferrellgas, L.P. (doing business as Blue Rhino) and UGI Corporation and AmeriGas Partners, L.P. (doing business as AmeriGas) (collectively "Defendants"), conspired to reduce the amount of propane they would put in their tanks and thereby raise the per-pound price of propane across the country in violation of federal antitrust law.

2.      Propane exchange tanks are portable cylinders storing propane gas, primarily used to power outdoor grills, as well as patio heaters and mosquito magnets.  Defendants supply propane in propane exchange tanks to thousands of gas stations, convenience stores, hardware

stores, grocery stores, and big box retailers ("Plaintiffs").

3.      In 2006 and 2007 Defendants' costs began to rise largely due to increasing fuel costs.  Increasing costs began to squeeze Defendants' profit margins, prompting AmeriGas to begin exploring whether it could effectively raise prices.  Ultimately, it determined that customers would not accept a price increase, at which point AmeriGas began to explore other options.

4.      Beginning in 2006, AmeriGas executives Carey Monaghan and Ken Janish began putting out feelers to Blue Rhino to determine what course of action Blue Rhino intended to take in response to rising costs.

5.      In 2008 Defendants' costs increased dramatically – both Blue Rhino and AmeriGas reported increases in costs of hundreds of millions of dollars due to increases in the price of propane, steel for the cylinders, and diesel for the transportation of the tanks.  These cost increases put significant pressure on Defendants' profit margins.  However, Defendants still believed their customers would not accept a price increase.  Accordingly, AmeriGas began exploring another option: maintaining the price of propane filled exchange tanks but decreasing the fill level.

6.      Until 2008, Blue Rhino and AmeriGas both packed their tanks with 17 pounds of propane. Starting no later than spring 2008, however, Blue Rhino and AmeriGas, through collusive conduct, reduced their fill levels to 15 pounds per tank while maintaining the same price per "full" tank, for the purpose of increasing their margins on the sale of propane exchange tanks. This collusion effectively raised the prices charged to Plaintiffs by more than 13% per pound.

7.      Blue Rhino and AmeriGas each knew that neither one could successfully force a

2

fill-level reduction—and thus a price hike—on all retailers if the other one presented a competitive, 17-pound option at the existing price. They therefore engaged in dozens of calls, emails, and in-person meetings to coordinate a unified front that would leave the largest retailers and then the entire industry with no choice but to accept their demands.

8.    Blue Rhino's President, Tod Brown, and AmeriGas's Director of National Accounts, Ken Janish, exchanged seven phone calls on June 18 and 19, 2008, during which AmeriGas agreed that if Blue Rhino reduced its fill levels to 15 pounds per tank, AmeriGas would follow suit.

9.    By October 2008, the propane conspiracy succeeded. Blue Rhino and AmeriGas forced Walmart and other large retailers to accept the fill reduction and ceased offering 17-pound tanks to smaller retailers like Glenville Shell. This concerted action had the purpose and effect of raising the effective wholesale prices at which Blue Rhino and AmeriGas sold propane in propane exchange tanks to retailers throughout the United States.

10.    Defendants further ensured that prices for propane and propane exchange tanks would remain high by agreeing to allocate customers and geographic markets.  During calls and meetings with AmeriGas executives, Janish repeatedly dismissed concerns that Blue Rhino might undercut AmeriGas on price or fill levels with words to the effect of, "I talked to Blue Rhino, and that's not going to happen."  Defendants' agreement not to undercut the collusive price increase (through the reduction in fill levels) by offering lower prices or raising fill levels, caused Plaintiff and other members of the Class to pay supracompetitive prices for propane and propane exchange tanks.

11.    Defendants' conduct amounts to a blatant violation of the antitrust laws, one that has rendered Blue Rhino and AmeriGas largely immune to market forces that should have

decreased the prices of propane exchange tanks since 2008.

12.     As Blue Rhino stated in its 2013 Form 10-K, it has "earned relatively greater gross margin per gallon" despite declining propane prices because it has been "able to manage the decline in sales price per gallon to a level below the corresponding decline in product prices." Such a result could not be achieved in a competitive market absent Defendants' conspiracy.

13.     On March 27, 2014, the Federal Trade Commission ("FTC") issued a complaint against Blue Rhino and AmeriGas, alleging that they violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. As the FTC concluded, Defendants' "conduct has restrained price competition and led to higher prices for sales of propane exchange tanks in the United States."

14.     Plaintiffs are direct purchasers of Defendants' filled propane exchange tanks and are thus the first payers of those illegally inflated prices. They therefore bring suit under the Sherman Act, 15 U.S.C. §§ 1 & 15, seeking treble damages to compensate their losses and deter future violations, as well as such equitable relief as the Court deems appropriate to ensure that Defendants refrain from colluding to violate the antitrust laws in the future.

15.     Defendants' conduct has restrained price competition and led to higher prices for propane exchange tanks in the United States. As a result of Defendants' conduct, Plaintiffs paid more for hundreds of thousands, if not millions, of pounds of propane.

## II.     PARTIES

16.     Plaintiff Glenville Shell LLC operates a gas station and convenience store in Greenwich, Connecticut. Since at least May 6, 2010, Glenville Shell has purchased filled propane exchange tanks from one or more of the Defendants and has paid inflated per-pound

4

prices due to Defendants' unlawful conspiracy.

17.     Defendant Ferrellgas, L.P. is a Delaware limited partnership, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. Ferrellgas, L.P. operates a nationwide propane distribution business, selling approximately 900 million gallons of propane annually. It sells propane exchange tanks nationally under the Blue Rhino name.

18.     Defendant Ferrellgas Partners, L.P., is a Delaware limited partnership, with its principal place of business located at 7500 College Boulevard, Overland Park, Kansas. According to Ferrellgas Partners, L.P.'s 2013 Form 10-K, Ferrellgas, L.P. is the general partner of Ferrellgas Partners, L.P., and performs all management functions for Ferrellgas Partners, L.P. and its subsidiaries.

19.     For the purposes of this complaint, "Blue Rhino" shall refer to Ferrellgas Partners, L.P., and Ferrellgas, L.P., collectively.

20.     Defendant AmeriGas Propane, L.P., is a Delaware limited partnership, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. AmeriGas Propane, L.P. operates a nationwide propane distribution business, selling nearly 1.4 billion gallons of propane annually. It sells propane exchange tanks nationally under the AmeriGas name, sometimes doing business as AmeriGas Cylinder Exchange. As of September 2011, AmeriGas exchange tanks were sold to more than 38,000 retail locations throughout the United States.

21.     Defendant AmeriGas Partners, L.P., is a Delaware limited partnership, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. According to AmeriGas Partners, L.P.'s 2013 Form 10-K, it conducts its business principally through its subsidiary, Defendant AmeriGas Propane, L.P. Between approximately

January 12, 2012 and July 1, 2013, AmeriGas Partners, L.P. also conducted business through Heritage Operating, L.P.

22.     AmeriGas Propane, Inc. is a Pennsylvania corporation, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. AmeriGas Propane, Inc., is the general partner of both AmeriGas Partners, L.P. and AmeriGas Propane, L.P. and is responsible for managing their operations.

23.     Defendant UGI Corporation is a Pennsylvania corporation, with its office and principal place of business located at 460 North Gulph Road, King of Prussia, Pennsylvania. UGI Corporation is the parent and sole owner of AmeriGas Propane, Inc.

24.     For the purposes of this complaint, "AmeriGas" shall refer to AmeriGas Propane, L.P., AmeriGas Propane, Inc., AmeriGas Partners, L.P., and UGI Corporation, collectively.

25.     Defendant Ken Janish is Director of National Accounts at AmeriGas.

### III.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337.

27.     This Court has personal jurisdiction over Defendants because they conduct sufficient business in this state to satisfy due process. Blue Rhino is headquartered in Kansas and sells propane exchange tanks in Kansas. AmeriGas knowingly transacted business in Kansas by selling propane exchange tanks and knowingly transacts business with Blue Rhino in Kansas, including in furtherance of the unlawful conspiracy alleged herein.

28.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(1)-(2) because Defendants conduct business in this judicial district, and because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this

6

judicial district.

29.     Venue in this District is particularly appropriate because a related indirect purchaser antitrust class action, *Ortiz v. Ferrellgas Partners, L.P.* (D. Kan.), was filed in this District in May 2014.

## IV.     RELEVANT MARKET

30.     The relevant product market is the wholesale market for sale of propane in propane exchange tanks.  The structure and characteristics of the market for propane in propane exchange tanks is particularly conducive to anticompetitive conduct.

31.     Propane and propane exchange tanks are homogeneous, standardized products. The propane sold by Blue Rhino is interchangeable with that sold by AmeriGas or any other propane supplier. Similarly, propane exchange tanks consist of a standardized tank and a standardized valve system.  Markets involving standardized, homogeneous products such as propane and propane exchange tanks are conducive to anticompetitive conduct and create an incentive to collude because market participants typically compete on the basis of price rather than other attributes such as product quality or customer service and because it is easier for members of the cartel to monitor potential cheating on the agreed-upon inflated price.

32.     Propane exchange tanks are manufactured and sold in a standard size with a maximum capacity of 25 pounds. For practical purposes, however, the maximum capacity is somewhat smaller. Due to safety regulations, propane exchange tanks cannot be filled to more than 80 percent capacity. Additionally, the National Fire Protection Association required use of an overfilling protection device ("OPD") as of 2002, reducing the available capacity even further to approximately 17.5 pounds. In practice, therefore, all propane exchange tanks have a standard maximum capacity of between 17 and 17.5 pounds.

33.     There are no widely used substitutes for propane exchange tanks that provide a similar ease of use. No other product significantly constrains the prices of propane exchange tanks.  The lack of available substitutes for a product creates an incentive to collude and also helps facilitate an effective price-fixing conspiracy.  Without substitutes, producers of the product can raise prices without losing significant sales to closely competing products.

34.     Prior to the introduction of propane exchange tanks, the only option for consumers who needed to purchase propane for outdoor grills, patio heaters, or similar uses was to purchase an empty cylinder and bring it to a filling location. In the 1990s, Defendants began providing exchange tanks, allowing consumers to exchange their empty cylinders for prefilled tanks, paying only for the propane. Propane exchange tanks quickly became popular due to the convenience and safety benefits for retailers in dispensing with large on-site propane tanks and training employees to perform refilling services, as well as the convenience and ease for consumers of obtaining a fresh, refurbished tank rather than refilling an old cylinder. This has led to a decline in the use of direct consumer refilling over the past ten years, such that that form of refilling does not place a constraint on the price of propane exchange tanks.

35.     The relevant geographic market is the United States. Most propane is produced in the Gulf Coast or Midwest, but can be sold nationwide due to the relative ease of transportation. Because of the widely distributed demand, sellers of propane and propane exchange tanks must have national reach and nationally distributed refilling facilities to compete effectively. As Blue Rhino stated in its 2013 Form 10-K, there are "few propane distributors that can competitively serve commercial and portable tank exchange customers on a nationwide basis. . . . [I]nvestments in technology similar to ours require both a large scale and a national presence, in order to generate sustainable operational savings to produce a sufficient

8

return on investment." Thus, propane exchange tank suppliers that lack a "large scale and a national presence" are unable to constrain the prices of propane exchange tanks.  At all times relevant to this complaint the market for propane in propane exchange tanks has been highly concentrated.  A high degree of concentration facilitates coordination among Defendants. Throughout the Class Period, Blue Rhino and AmeriGas were the two largest suppliers of propane and propane exchange tanks in the United States. Blue Rhino controlled approximately 50 percent of the national wholesale market for propane exchange tanks, while AmeriGas controlled approximately 30 percent. The next largest competitor, Heritage Propane Express, served less than ten percent of the market.

36.    The FTC has identified the wholesale marketing and sale of propane exchange tanks as a product market with a national geographic scope. *See* Compl., *In re Ferrellgas Partners, L.P.*, No. 9360, 2014 WL 1396496, ¶¶ 26-29 (Mar. 27, 2014).

## V.    THE PROPANE EXCHANGE PROCESS

37.    When Plaintiffs purchase filled propane exchange tanks from Defendants, they are typically offered the option of returning an empty tank to obtain a lower price. In turn, Plaintiffs sell the filled tanks to end users, offering a similar deal.

38.    After receiving empty tanks from Plaintiffs, Defendants bring the empty tanks to refurbishing and refilling facilities, where they prepare and refill the tanks to be redistributed to Plaintiffs.

39.    Beginning in or about 2006, Defendants entered into a series of "co-packing agreements." Pursuant to these agreements, each company agreed to refurbish and refill propane exchange tanks for the other company at certain of each company's facilities. Today, each Defendant processes slightly less than ten percent of the other company's used, empty tanks

9

pursuant to co-packing agreements. Blue Rhino refurbishes and refills exchange tanks for AmeriGas at Blue Rhino facilities in Florida, Colorado, Washington, and Missouri. AmeriGas refurbishes and refills exchange tanks for Blue Rhino at AmeriGas facilities in California and New Hampshire.

40.     Employees from Blue Rhino and AmeriGas participated in regular calls to discuss their co-packing agreements, presenting ample opportunities for conspiratorial communications.

## VI.     ANTICOMPETITIVE CONDUCT

### a.   In the Wake of Rising Costs Defendants Explore Conspiracy

41.     Prior to the conspiracy, most if not all suppliers of propane in propane exchange tanks, including both Defendants, filled their tanks at a standard 17 pounds.

42.     Beginning in 2006 and 2007, Defendants' costs began to increase largely as a result of increases in the price of gas.  Increasing costs squeezed Defendants' profit margins and, as a result, Carey Monaghan and Ken Janish of AmeriGas put the feelers out to Blue Rhino to explore whether Blue Rhino would agree to increase its prices or decrease fill levels. Monaghan and Janish indicated to Blue Rhino at that time that whatever steps Blue Rhino took in response to rising fuel costs AmeriGas would follow.

43.     In early 2008, Defendants faced rapidly increasing input costs, including increases in the cost of propane, steel for the tanks, and the diesel fuel for the delivery trucks. In response to an investigation by the Federal Trade Commission, Defendants have admitted that the industry faced dramatic increases in input costs.

44.     To forestall decreased profit margins, Blue Rhino and AmeriGas both considered decreasing the fill level in their propane exchange tanks to improve profitability in 2008.  Each

one knew, however, that it could not successfully do so if the other did not follow.

45.    In 2007 and 2008, AmeriGas foresaw "only modest growth in total demand" for propane, according to its Form 10-Ks. Thus, when it considered decreasing fill levels without decreasing per-tank prices in January 2008, AmeriGas recognized that major competitors could take significant business from it by maintaining their pre-existing fill levels at pre-existing prices. Accordingly, AmeriGas concluded that it could not implement a fill reduction at that time.

46.    In April 2008, Blue Rhino similarly considered a proposal to reduce its fill level from 17 pounds to 15 pounds, without a corresponding price reduction. Like AmeriGas, Blue Rhino recognized that such a move could be disastrous if it was the only supplier to make the change.

47.    Blue Rhino was particularly concerned that moving alone would put it at a competitive disadvantage with Walmart, which split its business among multiple suppliers to foster competition and fight price increases. At that time, Walmart was the largest retailer of propane exchange tanks in the United States. Blue Rhino supplied approximately 60 percent of Walmart locations, while AmeriGas supplied the other 35 percent. The remaining five percent was supplied by Ozark Mountain Propane Company ("Ozark"), a small regional supplier.

48.    As the Blue Rhino Director of Strategic Accounts responsible for Walmart reported to his manager: "[I]n my mind the 'watch out' is the competitive difference between [Blue Rhino, AmeriGas] and Ozark. We are offering less product vs. [Walmart's] other 2 suppliers. . . . Once we explain this is a done deal (and that we are not asking for [Walmart's] input or letting him decide), he may become resentful and threaten to take states. . . . Then, we need to pray that [AmeriGas] takes a similar move as soon as possible. If [AmeriGas] doesn't

move, we will have a BIG issue." He elaborated: "The only thing that can make this go away is if AmeriGas goes to 15 as well, but it has to happen very soon after us to legitimize our move."

49.     Blue Rhino's need to bring AmeriGas on board was even clearer after Blue Rhino broached the fill reduction with Walmart. On or about April 28, 2008, Blue Rhino's Director of Strategic Accounts informed a Walmart buyer that Blue Rhino intended to reduce its fill level. Walmart understood the proposed fill reduction to be a price increase and refused to agree. Walmart also said that it did not want to carry propane exchange tanks with different fill levels, implying that it might shift all business to AmeriGas and Ozark if forced to choose between 17-pound and 15-pound tanks.

50.     After this rejection, Blue Rhino began several months of communication and coordination designed to get AmeriGas to join its effort to force a fill reduction on Wal-Mart and other retailers.

51.     On or about May 23, 2008, Blue Rhino's Vice President of Operations, Jay Werner, met with an AmeriGas vice president responsible for the propane exchange tank business, ostensibly to discuss their co-packing arrangement. But, as AmeriGas's notes of the meeting reveal, Defendants used their co-packing cooperation to further anticompetitive goals. Among the topics discussed at the meeting were:

   a.  Blue Rhino's plan—not yet agreed to by any retailer—to reduce its fill level from 17 to 15 pounds;

   b.  Blue Rhino's desire to exclude Heritage Propane, a small maverick competitor, from access to refilling facilities that a third party was considering building; and

   c.  Each Defendant's costs of refilling at various facilities.

12

52.     On May 29, 2008, Blue Rhino proposed the fill reduction to Lowe's, Blue Rhino's largest retail customer. Lowe's accepted the proposal, but only on the condition that Blue Rhino convert all of its other customers, including Walmart, to 15-pound tanks within 30 days of implementing the fill reduction at Lowe's.

53.     From June 18 to June 19, 2008, Blue Rhino's President, Tod Brown, exchanged seven phone calls with AmeriGas's Director of National Accounts, Ken Janish. During that time, AmeriGas indicated to Blue Rhino that it would follow closely behind Blue Rhino if it successfully implemented its fill reduction, and that it would not sell both 15-pound and 17-pound tanks.  Janish had similar conversations with employees of Blue Rhino on numerous occasions from at least as early as 2007 until at least late 2010.

54.     Other AmeriGas executives were aware of and condoned Janish's unlawful conversations with Blue Rhino, as those conversations were frequently mentioned during AmeriGas business meetings and bi-weekly sales and operations conference calls.  The AmeriGas executives who participated in these calls and were aware of Janish's discussions with Blue Rhino included President and CEO Gene Bissell, Director of Operations Bo Cornall, Vice President Carey Monaghan, Vice President Joe Powers, National Account Manager Michele McMahon, and National Account Manager Randy Doub.

55.     During calls and meetings with these and other AmeriGas executives, Janish repeatedly dismissed concerns that Blue Rhino might undercut AmeriGas on price or fill levels with words to the effect of, "I talked to Blue Rhino, and that's not going to happen."

56.     On June 20, 2008, AmeriGas management produced a draft budget incorporating a fill reduction from 17 to 15 pounds.

57.     Brown again spoke with an AmeriGas executive (this time, AmeriGas's

13

President of Sales and Marketing) about the fill reduction a few days later, on June 25, 2008. That same day, Blue Rhino began informing its retail customers that it planned to reduce the fill level in its propane exchange tanks as of July 21, 2008.

58.     The next day, Blue Rhino's Werner again spoke with an AmeriGas employee about the fill reduction, discussing (among other things) the timing for rolling out the fill reduction to their customers.

59.     No later than the last week of June 2008, Blue Rhino and AmeriGas had agreed on both the fill reduction and a rollout plan. Blue Rhino would begin selling 15-pound tanks on July 21, 2008, and AmeriGas would follow on August 1, 2008.

60.     When AmeriGas announced the reduction to its employees on July 15, 2008, it made it clear that it was acting not just on its own but in collaboration with Blue Rhino. It explained: "In an attempt to offset some of these expenses, achieve desired product margins, and maintain retail prices at an attractive level for consumers, AmeriGas Cylinder Exchange *and other national providers* are transitioning to a 15 pound cylinder. This slight decrease from current 17 pound levels *will quickly become the industry standard* . . . ." (Emphasis added.)

61.     Similarly, AmeriGas told its production team that "[t]he major competitors in cylinder exchange will also be moving to a 15 pound cylinder and as a result, it will become the industry standard." The only "major competitor[]" AmeriGas was referring to was its co-conspirator Blue Rhino—but as AmeriGas knew, the two of them acting together would be sufficient to move most, if not all, of the industry to the 15-pound standard.

**b.  The Conspirators' Joint Effort to Force the Fill Reduction on Walmart**

62.     As discussed above, Lowe's, Blue Rhino's largest customer, agreed to accept the fill reduction only on the express condition that Blue Rhino converted its other customers,

including Walmart, to 15-pound tanks. Defendants knew that other retailers might similarly balk at the 15-pound tanks if their retail competitors were selling 17-pound tanks. Accordingly, Blue Rhino and AmeriGas knew that their efforts could not succeed if they failed to impose the fill reduction on the most prominent retailer, Walmart.

63.    However, Walmart had resisted Blue Rhino's early effort to impose the fill reduction. As discussed above, it was clear to Blue Rhino that Walmart would not accept a fill reduction coming from Blue Rhino alone, and might even take business away from Blue Rhino if Blue Rhino pressed the issue.

64.    It was thus clear to Defendants that they needed to present a united front to Walmart so that it had no choice but to accept the fill reduction. Accordingly, Defendants engaged in a concerted, coordinated effort to convert Walmart to 15-pound tanks.

65.    From July 2008 through October 2008, sales executives from the two Defendants communicated repeatedly by telephone and email to discuss their progress with Walmart and to maintain their joint commitment to the scheme to reduce fill levels.

66.    When AmeriGas first announced its intention to reduce its fill levels to Walmart, it made clear that Walmart faced a new "industry standard" and not just a negotiable effort by AmeriGas. For example, on July 10, 2008, AmeriGas's Director of National Accounts emailed Walmart's buyer to inform him that "the *cylinder exchange industry* is planning a move to a standard weight of propane in a tank from 17 lbs. net to 15 lbs. net." (Emphasis added.)

67.    Walmart initially rejected AmeriGas's proposal, as it had Blue Rhino's. The following day, July 10, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts discussed Walmart's position over the phone.

68.    On or about July 21 and 22, 2008, the two executives again spoke at length by

15

telephone, discussing AmeriGas's plans for overcoming Walmart's rejection of the fill reduction.

69.    On or about August 11, 2008, the AmeriGas Director of National Accounts called Blue Rhino's Vice President of Sales to inform him that he was having trouble getting in touch with Walmart to discuss the reduction in fill levels.

70.    Blue Rhino strategized internally as to how AmeriGas could make headway with Walmart. On or about August 13, 2008, the Blue Rhino sales executives responsible for dealing with Walmart discussed the possibility of advising AmeriGas to ensure that Home Depot, AmeriGas's largest retail customer, was visibly supplied with the reduced 15-pound tanks, because Walmart would be more likely to accept the fill reduction if it knew that Home Depot had already accepted it.

71.    On August 21, 2008, Blue Rhino and AmeriGas sales executives spoke several times by telephone. Shortly after these communications, the AmeriGas sales executive and AmeriGas's operations manager directed their colleagues to do exactly what Blue Rhino had discussed internally: ensure that the Home Depot store in Rogers, Arkansas (near Walmart's Bentonville headquarters) carried only 15-pound tanks.

72.    On September 2, 2008, Blue Rhino's Vice President of Sales and AmeriGas Director of National Accounts spoke by telephone again. They discussed their respective efforts to convert their various customers to 15-pound tanks, as well as the current retail pricing of tanks at Lowe's.

73.    On September 12, 2008, Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke by telephone again to discuss the status of their negotiations with Walmart. AmeriGas's Director of National Accounts suggested issuing an

16

ultimatum to Walmart, to which Blue Rhino's Vice President of Sales responded by encouraging AmeriGas to "hang in there."

74.    Blue Rhino's Vice President of Sales and AmeriGas's Director of National Accounts spoke by telephone at least twice more over the next two weeks.

75.    On September 30, 2008, the AmeriGas Director of National Accounts emailed Blue Rhino's Vice President of Sales to inform him that Walmart management was planning to discuss the proposed fill reduction the following day.

76.    As October 2008 began, however, Walmart had still not agreed to Defendants' demands. On October 6, the Lowe's buyer reminded Blue Rhino that it had agreed to accept 15-pound tanks on the condition that all other Blue Rhino customers would be converted within 30 days. Lowe's observed that Walmart was still selling 17-pound tanks, putting Lowe's at a competitive disadvantage. The Lowe's buyer demanded that Blue Rhino either move all of its customers to 15-pound tanks or convert Lowe's back to 17-pound tanks at the same price it was paying for the 15-pound tanks.

77.    Pressured by Lowe's demand, Blue Rhino's President forwarded the Lowe's email to his Vice President of Sales and directed him to obtain Walmart's acceptance of the fill reduction that day. The Blue Rhino Vice President of Sales took action almost immediately—by calling AmeriGas's Director of National Accounts for 16 minutes.

78.    After hanging up with the AmeriGas Director of National Accounts, the Blue Rhino Vice President of Sales emailed Walmart to demand that it accept the fill reduction.

79.    Early the next morning, the AmeriGas Director of National Accounts emailed Walmart in similar language, urging it to implement the fill reduction.

80.    On October 10, 2008, presented with identical demands from its only two

17

national propane exchange tank suppliers, Walmart capitulated and accepted the fill reduction from both Blue Rhino and AmeriGas.

81.     Without this coordinated action and mutually reinforced resolve, Defendants likely would not have been able to convince Walmart to accept their proposal and thus would also have lost the ability to convert Lowe's and other retailers to 15-pound tanks. Rather than prepare their facilities to fill both 15-pound and 17-pound tanks, they likely would have had to abandon their scheme to reduce the amount of propane supplied to Plaintiffs (and thereby increase the price of propane). But Defendants' combined efforts succeeded in forcing Walmart and the rest of their retail customers to accept 15-pound tanks at what had previously been 17-pound prices, raising the price per pound of propane by more than 13 percent.

82.     Defendants' conspiracy had the purpose and effect of restraining competition, limiting supply, and increasing prices for filled propane exchange tanks.

### c.     Market Allocation

83.     AmeriGas and Blue Rhino also agreed to allocate customers and markets between themselves in furtherance of their collusion to maintain prices at supracompetitive levels.

84.     For example, AmeriGas took Wal-Mart's West Coast business and Blue Rhino took Wal-Mart's East Coast business.  Similarly, Blue Rhino was allocated all of Kroger's business and AmeriGas was allocated all of Albertson's business.

85.     Through at least the end of 2010, Defendants regularly communicated to assure compliance with the conspiracy.  Defendants also monitored the market to ensure that neither cheated on their anticompetitive agreement.   Should cheating be suspected, Defendants communicated with each other to reassure each other of their compliance with the conspiracy.

18

86.     For example, in or about 2008, Janish approached Circle K about renewing its contract with AmeriGas.  The Circle K representative told Janish that Blue Rhino had offered more favorable terms than AmeriGas was offering.  Janish then contacted a Blue Rhino executive, who denied that Blue Rhino had offered more favorable terms to Circle K.  After this conversation, Circle K renewed its contract with AmeriGas.

## VII.    PRIOR ACTIONS

### a.  Prior Class Action

87.     Beginning in June 2009, purchasers of propane exchange tanks brought more than a dozen class action lawsuits against Defendants alleging that the conduct described above violated deceptive marketing laws.

88.     On August 6, 2009, the first antitrust class action claim was filed against Defendants in *Downs v. Ferrellgas Partners, L.P.*, No. 09-cv-2412 (D. Kan.). The *Downs* plaintiffs sought to represent a class of "[a]ll persons who purchased one or more of Defendants' pre-filled 20-pound capacity Propane Gas Tanks, during the applicable limitations that contained under 17 pounds of propane gas." Compl., *Downs*, ECF No. 1, Aug. 6, 2009, ¶ 27. The proposed class was not limited to indirect purchasers. Glenville Shell and the other Plaintiffs in this case were thus absent class members in *Downs*.

89.     The 2009 actions were transferred to the District Court for the Western District of Missouri for pretrial consolidation and coordination by the Judicial Panel on Multidistrict Litigation.

90.     On February 22, 2010, counsel for the consolidated class actions filed a consolidated class action complaint, seeking to represent a class of "[a]ll persons who purchased a Propane Tank sold, marketed, or distributed by any Defendant during the

applicable limitations periods" bringing claims under, *inter alia*, 15 U.S.C. § 1. The proposed class was not limited to indirect purchasers. Glenville Shell and the other Plaintiffs in this case were thus absent class members *in Downs*.

91.     On December 9, 2009, the consolidated plaintiffs filed a motion for certification of a settlement class and preliminary approval of a proposed settlement with AmeriGas. The settlement class was defined to include "[a]ll people in the United States who purchased or exchanged an AmeriGas 20-pound propane gas cylinder, *not for resale*, between August 1, 2008 and November 30, 2009." *In re Pre-Filled Propane Tank Mktg. & Sales Prac. Litig.*, No. 09-cv-465 (W.D. Mo.) ("*In re Pre-Filled Propane Tank*"), ECF No. 37, Dec. 8, 2009 (emphasis added). Because Glenville Shell and the rest of the proposed class in this case purchased propane exchange tanks for resale, they were not members of this settlement class.

92.     On October 6, 2010, the court granted final approval to the AmeriGas class settlement. Although there were various changes made to the settlement, the class definition still excluded Glenville Shell and the rest of the proposed class in this case.

93.     On October 6, 2011, the consolidated plaintiffs filed a motion for certification of a settlement class and preliminary approval of a proposed settlement with Blue Rhino. The settlement class was defined to include [a]ll people in the United States who purchased or exchanged one or more of Ferrellgas's 20-pound propane gas cylinders, *not for resale*, between June 15, 2005, and the date of Preliminary Approval." *In re Pre-Filled Propane Tank*, No. 09-cv-465 (W.D. Mo.), ECF No. 249, Oct. 6, 2011 (emphasis added). Because Glenville Shell and the rest of the proposed class in this case purchased propane exchange tanks for resale, they were not members of this settlement class.

94.     On May 31, 2012, the court granted final approval to the Blue Rhino class

settlement.

95.     Despite their settlements, Defendants continued to conspire, and rather than resuming competition, maintained their illegally agreed-upon fill levels, preserving the unlawfully inflated prices that their conspiracy had produced.

96.     Moreover, in furtherance of the conspiracy, Defendants continued to have regular communications regarding pricing, fill levels, and market allocation until at least late 2010.

**b.  FTC Complaint**

97.     On March 27, 2014, the Federal Trade Commission issued a complaint against Ferrellgas Partners, L.P., Ferrellgas, L.P., AmeriGas Partners, L.P., and UGI Corp., alleging substantially the same conspiracy as alleged here. That complaint is currently pending.

**c.  *Ortiz* Complaint**

98.     On May 30, 2014, Mario Ortiz, Steven Morrison, and Stephen Tseffos filed a complaint in this District on behalf of indirect purchasers of propane exchange tanks from Defendants, alleging that Blue Rhino and AmeriGas conspired to fix fill levels for propane exchange tanks. *Ortiz v. Ferrellgas Partners, L.P.*, No. 14-cv-2257 (D. Kan.).

**VIII.   INJURY TO GLENVILLE SHELL AND CLASS MEMBERS**

99.     As described herein, as a result of Defendants' conspiracy, Plaintiffs and other class members paid a higher price per pound for filled propane exchange tanks than they would have paid in a competitive market.

100.    Plaintiff Glenville Shell has purchased filled propane exchange tanks from Blue Rhino on multiple occasions during the conspiracy.  For example, on January 14, 2013, it purchased ten filled propane exchange tanks from Blue Rhino—each containing only 15 pounds of propane, pursuant to the conspiracy, but sold at the price it would have been charged for 17-

21

pound tanks but for the conspiracy.

## IX.   CLASS ACTION ALLEGATIONS

101.   Plaintiff Glenville Shell  sues on its own behalf and pursuant to Federal Rule of Civil Procedure 23(b)(3) and (b)(2) on behalf of the following nationwide class of persons ("Nationwide Class"):

> All entities in the United States who purchased for resale propane in a propane exchange tank directly from Defendants, or paid to exchange a previously purchased propane exchange tank directly with Defendants, between July 21, 2008, and the date judgment is entered in this case. Excluded from the class are Defendants, their affiliates, subsidies, and parents, and their respective directors, officer, employees, legal representatives, and agents. Any judge to whom this case is assigned and any other person described in 28 U.S.C. § 455(b)(4)-(5) is also excluded.

102.   The class contains thousands if not tens of thousands of members, as Defendants supply propane exchange tanks to tens of thousands of retail locations. The class is so numerous that individual joinder of all members is impracticable.

103.   The class is ascertainable either from Defendants' records or through self-identification in a claims process.

104.   Glenville Shell's claims are typical of the claims of other class members as they arise out of the same course of conduct and the same legal theories, and Glenville Shell challenges Defendants' conduct with respect to the Class as a whole.

105.   Glenville Shell has retained able and experienced class action litigators as its counsel. Glenville Shell has no conflicts with other class members and will fairly and adequately protect the interests of the Class.

106.   The case raises common questions of law and fact that are capable of classwide resolution, including:

> a.   whether Blue Rhino and AmeriGas violated section 1 of the Sherman Act by

conspiring to reduce the fill level in propane exchange tanks from 17 pounds to 15 pounds, without a corresponding price reduction;

b.   whether Blue Rhino and AmeriGas violated section 1 of the Sherman Act by conspiring to force the fill reduction on Walmart and other retailers;

c.   whether Blue Rhino and AmeriGas violated section 1 of the Sherman Act by engaging in an anticompetitive exchange of sensitive information, including their plans regarding fill reductions and negotiations with retailers;

d.   whether Blue Rhino and AmeriGas violated section 1 of the Sherman Act by agreeing to allocate customers and markets;

e.   whether class members have suffered antitrust injury;

f.   the extent to which Defendants' conduct inflated prices for propane exchange tanks above competitive levels;

g.   the nature and scope of injunctive relief necessary to restore a competitive market; and

h.   the effect of the 2009 actions on the statute of limitations for Plaintiffs' claims.

107.   These common questions predominate over any questions affecting only individual class members.

108.   A class action is superior to any other form of resolving this litigation. Many class members, including Glenville Shell, suffered damages that are too small individually to justify embarking on expensive, protracted antitrust litigation against Defendants. If this case does not proceed as a class action, it is likely that few if any Plaintiffs would bring suit based on Defendants' unlawful conduct. Additionally, separate actions by individual class members

23

would be enormously inefficient and would create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims.

## X.   STATUTE OF LIMITATIONS

### a.  Continuing Violation

109.    Despite settling with indirect purchasers, Defendants have continued to offer only 15-pound tanks to Plaintiffs, continuing their conspiracy to inflate prices and suppress competition on fill level and pricing.

110.    Defendants' unlawful communications regarding pricing, fill levels, and market allocation continued until at least late 2010.

111.    Defendants' sales pursuant to the conspiracy continue to the present day. Accordingly, Plaintiffs may recover for damages they suffered at any point during the conspiracy.

### b.  Fraudulent Concealment

112.    Before August 6, 2009, when the first antitrust claims against Defendants were filed, a reasonable person under the circumstances would have believed the propane exchange tank market to be a competitive industry and, thus, would not have been alerted to begin to investigate the independence of Defendants' fill and pricing decisions before that time.

113.    Conspiracies to inflate prices, constrain output, and set content levels are, by their very nature, inherently self-concealing. If a price-fixing conspiracy is to be successful, the participants must ensure that customers and regulators do not discover the existence of the conspiracy.

114.    Defendants' acts in furtherance of the conspiracy were concealed and carried out

in a manner specifically designed to avoid detection. Plaintiffs and members of the Class did not discover and could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence.

115. Throughout the Class Period, Defendants falsely represented that the market was operating competitively. For example, on September 28, 2009—just eight days before Blue Rhino and AmeriGas executives privately discussed their final ultimatum to Walmart—Blue Rhino stated in its 2008 Form 10-K that "[t]he propane distribution business is highly competitive . . . ." It has made similar claims every year since, despite knowing that it was in fact working in combination with its main competitor to limit competition in the market for filled propane exchange tanks.

116. Similarly, AmeriGas stated in its 2008 Form 10-K, filed a month after it had secretly colluded to present uniform demands on Walmart, that "[t]he domestic propane retail distribution business is highly competitive." It has made similar claims every year since.

117. Because Defendants' conspiracy, including the communications described above, were kept secret, and as a result of Defendants' affirmative acts done and false statements made in order to conceal their conspiracy, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct until the first antitrust complaint was filed, and they did not know before that time that they were paying supracompetitive prices for filled propane exchange tanks during the Class Period.

   c. *American Pipe* **Tolling**

118. As described above, a putative class action antitrust suit, eventually known as *In re Pre-Filled Propane Tank*, was brought against Defendants on August 6, 2009.  At the time it was brought, Glenville Shell and the other class members in this case were part of that putative

nationwide class.

119.   Glenville Shell and the other class members remained part of the putative *In re Pre-Filled Propane Tank* class against all Defendants until at least December 9, 2009, when the class plaintiffs in that case first disclosed that they were seeking to certify a settlement class as to AmeriGas that excluded direct purchasers of propane exchange tanks for re-sale.

120.   After disclosing the AmeriGas settlement, the plaintiffs in the prior litigation filed a consolidated complaint against Blue Rhino that continued to seek to represent a nationwide class of all purchasers of propane exchange tanks, including direct purchasers such as Glenville Shell and the other class members in this case.

121.   Glenville Shell and the other class members remained part of the putative *In re Pre-Filled Propane Tank* class against Blue Rhino until at least October 6, 2011, when the class plaintiffs in that case first disclosed that they were seeking to certify a settlement class as to Blue Rhino that excluded direct purchasers of propane exchange tanks for resale.

122.   Accordingly, the claims of Glenville Shell and other class members were tolled against AmeriGas from at least August 6, 2009 to at least December 9, 2009, and against Blue Rhino from at least August 6, 2009 to October 6, 2011.

### d.  FTC Action

123.   As described above, the FTC filed an administrative complaint against Defendants on March 27, 2014, alleging substantially the same course of anticompetitive conduct.

124.   The FTC action is a civil proceeding "instituted by the United States to prevent, restrain, or punish violations of . . . the antitrust laws," and therefore suspends the statute of limitations for Plaintiffs' action from March 27, 2014 until one year after the resolution of that

action. 15 U.S.C. § 16(i).

## XI.   CAUSE OF ACTION—VIOLATION OF SECTION 1 OF THE SHERMAN ACT

125.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

126.   Blue Rhino and AmeriGas, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Blue Rhino and AmeriGas unlawfully agreed to reduce the fill levels of their tanks without reducing the price of the filled tanks, thereby effectively raising the price charged for propane in those tanks.  Blue Rhino and AmeriGas further agreed, in violation of 15 U.S.C. § 1, to allocate customers and markets.

127.   Defendants distribute, sell, ship, and refill propane exchange tanks nationwide and across state lines, such that the conduct alleged herein affected interstate commerce

128.   Defendants' conduct injured class members by depriving them of wholesale competition over price and terms and raising the per-pound price of propane exchange tanks.

129.   Defendants' conduct is continuing and has caused damages to Plaintiffs through the present.

130.   Defendants' conduct will continue to impose antitrust injury on class members unless equitable relief is granted.

131.   The equitable relief outlined below is necessary to deter future antitrust violations, redress Plaintiffs' and class members' injuries, and restore competition to the market for propane exchange tanks.

## XII.   PRAYER FOR RELIEF

132.    WHEREFORE, Plaintiff Glenville Shell, on behalf of itself and a class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

a.   Certification of the class described in ¶ 88 pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.   Appointment of Glenville Shell as Class Representative and its counsel of record as Class Counsel;

c.   Compensatory damages in an amount to be proven at trial and trebled thereafter;

d.   Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.   An injunction requiring Defendants to increase their fill levels to the level in existence prior to the anticompetitive conduct;

f.   An injunction voiding or regulating Defendants' co-packing agreements and prohibiting defendants from sharing pricing information, negotiation plans, information regarding future fill reductions, or other competitively sensitive information;

g.   The costs of bringing this suit, including reasonable attorneys' fees and expenses;

h.   An incentive award to compensate Glenville Shell for its efforts in pursuit of this litigation; and

i.   All other relief to which Glenville Shell and the Class may be entitled at law or in equity.

## XIII.   JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

133.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury on all issues so triable. Pursuant to Local Rule 40.2, Plaintiffs hereby designate Kansas City, Kansas as the place of trial in this action.

Dated:    September 8, 2014                    Respectfully submitted,

   __/s/ Isaac L. Diel_____

Isaac L. Diel
SHARP McQUEEN, P.A.
419 North Kansas Avenue
Liberal, KS 67905-2619
(913) 661-9541
idiel@sharpmcqueen.com

Richard A. Koffman
Kit A. Pierson
Emmy L. Levens
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 500
Washington, DC  20005
(202) 408-4600
rkoffman@cohenmilstein.com
kpierson@cohenmilstein.com
elevens@cohenmilstein.com

Roberta D. Liebenberg
Donald L. Perelman
FINE, KAPLAN AND BLACK, R.P.C.
1835 Market Street, 28th Floor
Philadelphia, PA  19103
(215) 567-6565
rliebenberg@finekaplan.com
dperelman@finekaplan.com

Joseph Goldberg
FREEDMAN BOYD DANIELS HOLLANDER &
   GOLDBERG, PA
20 First Plaza, Suite 700
Albuquerque, NM  87102
(505) 842-9960
jg@fbdlaw.com