**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| IN RE:  PRE-FILLED PROPANE | ) | **MDL NO. 2567** |
| TANK ANTITRUST LITIGATION | ) | |
| | ) | **Master Case No. 14-02567-MD-W-GAF** |
| | ) | |
| INDIRECT PURCHASER ACTIONS | ) | |

## ORDER

Now before the Court is the Indirect Purchaser Plaintiffs' (hereinafter, "Plaintiffs") Motion for Class Certification (Doc. # 476).  Defendant Ferrellgas L.P. ("Ferrellgas") opposes.  (Doc. # 494).  On September 23, 2021, the parties appeared before the Court for a hearing on Plaintiffs' Motion.  (Doc. # 602).  For the reasons set forth below, and upon consideration of the pleadings, evidence, and arguments presented, Plaintiffs' Motion for Class Certification is DENIED.

## DISCUSSION

## I.       BACKGROUND

The Court has previously discussed the extensive factual and procedural background of this case.  (*See* Master Case, Doc. ## 333, 355).[1]  The Court thereby provides only the background relevant to Plaintiffs' instant motion for class certification.

This case involves portable propane exchange tanks and two of the nation's leading suppliers of them—Ferrellgas and AmeriGas.  Portable propane exchange tanks are used in barbeques, patio heaters, generators, and other outdoor equipment.  Unlike portable propane tanks that need to be refilled, propane exchange tanks offer customers the convenience of exchanging an empty propane tank for a new, filled tank at retail outlets such as big box stores, grocery chains, hardware stores, gas stations, and convenience stores.  Two types of propane exchange tanks are

---

[1]  Master Case refers to No. 4:14-md-02567-GAF (W.D. Mo.). All docket citations will be to the Master Case unless otherwise noted.

1

available for purchase: (i) spare tanks, which are those where a customer purchases the cylinder itself and the propane in it; and (ii) exchange tanks, where a customer returns an empty cylinder and purchases a filled tank in exchange.

Plaintiffs seek to represent a putative class of customers who purchased AmeriGas and Blue Rhino branded portable propane exchange tanks from various retailers in 13 states.[2]  In relation to Defendants AmeriGas and Ferrellgas (which sells tanks under the Blue Rhino brand), Plaintiffs are indirect purchasers of spare and exchange tanks.  Retailers purchase spare and exchange tanks directly from AmeriGas and Ferrellgas at wholesale prices; those retailers then resell those tanks to the customers that comprise the putative class here.

Plaintiffs allege that AmeriGas and Ferrellgas engaged in an ongoing conspiracy to fix the fill levels of their propane exchange tanks.  (Doc. # 198 ("Complaint" ¶ 1)).  They claim that in 2008, in response to a spike in the price of propane, AmeriGas and Ferrellgas agreed with each other to reduce the fill level of their propane exchange tanks from 17 to 15 pounds without a corresponding reduction in wholesale price.  (*Id.* at ¶¶ 50–92).  The alleged purpose and effect of this agreement was to raise the wholesale price at which AmeriGas and Ferrellgas sold their propane exchange tanks.  (*Id.* at ¶ 93).

A prior action was brought in 2009 by a putative class of indirect purchasers against AmeriGas and Ferrellgas based upon the same alleged 2008 fill-reduction conspiracy.  *See In re: Pre-Filled Propane Tank Marketing & Sales Practices Litig.*, No. 4:09-md-2086-GAF (W.D. Mo.) ("*Propane I*").  AmeriGas settled that lawsuit on December 1, 2009, and Ferrellgas settled on

---

[2]    Plaintiffs originally asserted a federal injunctive relief claim and state law claims from 24 different states.  The Court dismissed Plaintiffs' federal injunctive relief claim, and that dismissal was affirmed on appeal by the Eighth Circuit.  (Doc. # 283).  Subsequently, Defendants moved for judgment on the pleadings on Plaintiffs' remaining state law claims and the Court granted the motion in part as to 11 of Plaintiffs' 24 state law claims.  (Doc. # 355).  Accordingly, Plaintiffs moved for class certification on their remaining 13 state law claims.

2

October 14, 2011. (*See Propane I*, Doc. ## 38-3, 250-1, 289).

The current action was filed on May 30, 2014. Plaintiffs allege that despite the prior class-wide settlements with indirect purchaser plaintiffs in the *Propane I* actions, the conspiracy persisted. (*See* Master Case, Complaint, ¶¶ 96, 100). Following years of motion practice and an appeal to the Eighth Circuit, what remains are state law claims brought on behalf of a putative class of indirect purchasers from 13 states. Prior to the commencement of class certification briefing, on September 18, 2020, AmeriGas settled with Plaintiffs, leaving Ferrellgas as the only remaining defendant. (Doc. ## 471, 541).

Plaintiffs moved to certify a multi-state damages class under Federal Rule of Civil Procedure 23(b)(3) consisting of all persons in Arizona, Nevada, North Carolina, New Mexico, Maine, Minnesota, Michigan, South Dakota, Utah, California, Iowa, North Dakota, and West Virginia who purchased (i) AmeriGas spare or exchange tanks between December 1, 2009 and the date judgment is entered in this action or (ii) Blue Rhino spare or exchange tanks between October 14, 2011 and the date judgment is entered in this action.[3] ( Doc. # 476 at p. 5). In support of their motion, and as their proposed common proof of class-wide injury and damages, Plaintiffs offered economic analyses and opinions by Professor Daniel A. Ackerberg, a professor of economics at the University of Texas. (Doc. # 476-1).

Professor Ackerberg put forth an analysis purporting to show that common evidence and methods demonstrate that the 2008 fill reduction by Ferrellgas and AmeriGas caused all of the indirect purchaser class members to uniformly pay supracompetitive per-gallon prices for

---

[3]     Plaintiffs also sought conditionally to certify a multi-state class of supposed end customers who "directly" purchased AmeriGas and Blue Rhino spare and exchange tanks during the same alleged class period. (*See* Doc. # 476 at p. 5). At the time Plaintiffs moved for class certification, their motion for leave to amend their complaint to add "direct purchaser" claims based on customer purchases of tanks from AmeriGas and Blue Rhino vending machines was then pending. (Doc. ## 426, 427). The Court subsequently denied Plaintiffs' motion for leave to amend, thereby mooting their alternative request to certify a "direct purchaser" class. (*See* Doc. # 491).

AmeriGas and Ferrellgas propane exchange tanks throughout the alleged class period. (*See generally id.*).[4] Professor Ackerberg offered regression analyses to determine a set of common, average overcharges that he claims represent the average inflated prices per gallon of propane paid by AmeriGas's and Ferrellgas's direct retailer customers for both spares and exchange tanks due to the 2008 fill reduction. (*Id.*). Instead of calculating overcharges allegedly incurred by each of Ferrellgas's and AmeriGas's individual retailers (or even certain of their largest ones), Professor Ackerberg's method averaged all of the wholesale prices for AmeriGas and Blue Rhino tanks to calculate an average price per gallon, from which he then calculated an average per-gallon overcharge for AmeriGas and Blue Rhino spare and exchange tanks. (*Id.*).

Professor Ackerberg also conducted pass-through studies for three retailers, and used those studies as the basis to opine that all of AmeriGas's and Ferrellgas's thousands of retailer customers passed on overcharges at a "conservative" rate of 100% to their customers (and the putative class members) who purchased AmeriGas and Blue Rhino propane tanks during the class period. Based on these analyses, Professor Ackerberg initially estimated $117 million as a reasonable measure of classwide damages (before trebling) to the putative indirect purchaser class. (*Id.*).

Ferrellgas opposed certification, primarily on the ground that Plaintiffs failed to satisfy their burden of establishing predominance under Rule 23(b)(3). (Doc. # 494). In support, Ferrellgas submitted an expert declaration by Professor Kevin Murphy, a Professor of Economics at the University of Chicago. (Doc. # 494-1). Professor Murphy conducted an independent analysis of the market, including Defendants' pricing to their various customers throughout the proposed class period, and then provided a number of critiques and conducted economic analyses to test the reliability of the common proof of a class-wide overcharge to the putative class advanced

---

[4] By way of introduction, the Court generally cites to the expert reports. However, specific cites to expert opinions referenced are provided in the "Analysis" section of this Order.

by Professor Ackerberg. (*See generally id.*). Among other things, Professor Murphy conducted various pricing analyses, all of which indicated how the wholesale prices-per gallon of AmeriGas's and Ferrellgas's spares and exchange tanks varied widely amongst retailers throughout the class period and changed constantly due to individualized pricing negotiations. (*Id.*). Professor Murphy also ran Professor Ackerberg's own overcharge regressions with individualized retailer data, rather than average wholesale prices, to opine that Professor Ackerberg's use of a single average overcharge estimate wrongly attributed an overcharge to significant percentages of sales of AmeriGas's and Ferrellgas's propane tanks during the class period—sales for which there was in fact insufficient evidence of any overcharges. (*Id.*).

Professor Murphy further opined on various design flaws within Professor Ackerberg's average overcharge regressions, all of which Professor Murphy claims undermine the reliability of whether Professor Ackerberg's regressions are capable of determining and isolating the impact of an anticompetitive overcharge due to the alleged conspiracy, as opposed to myriad other non-collusive factors that could have affected the wholesale per-gallon prices of AmeriGas's and Ferrellgas's spare and exchange tanks. (*Id.*). As for Professor Ackerberg's pass-through studies, Professor Murphy opined that they are unreliable because they do not actually measure a pass-through rate or isolate whether (and the extent to which) a cost *change* at the wholesale level causes a *change* in the retail price to consumers. (*Id.*). Further, Professor Murphy opined that Professor Ackerberg's pass-through studies, based on data from just three retailers, is not representative and cannot be used to infer a common pass-through rate for thousands of retail customers. (*Id.*).

On reply, Plaintiffs offered a supplemental analysis by Professor Ackerberg. (*See* Doc. # 540-1). Professor Ackerberg purported to address the various critiques advanced by Professor Murphy, and offered new overcharge regressions that continued to estimate an average overcharge paid by Ferrellgas's and AmeriGas's retailer customers through January 31, 2015. (*Id.*

5

pp. 9-10 ¶ 36). This revised overcharge regression corresponded with revisions made by Plaintiffs to their proposed class period, which they limited on reply to the end of January 31, 2015. (Doc. # 540, p. 10 n.19). Plaintiffs made these adjustments to reflect the Court's January 21, 2020, Order denying Plaintiff's motion to compel documents and data post January 2015.[5] Beyond the revised regression analysis, Professor Ackerberg's reply declaration included new opinions and evidence. (*See generally* Doc. # 540-1). Plaintiffs also submitted 37 additional exhibits. (*Id.*). Because of the altered class period, Professor Ackerberg also adjusted his estimated class-wide damages number from $117 million to $54 million (before trebling). (*Id.* at p. 63).

Ferrellgas moved for and the Court granted it leave to file a sur-reply and a corresponding declaration by Professor Murphy to address the new and additional analyses and evidence set forth by Plaintiffs and Professor Ackerberg on reply. (Doc. # 587).

With Plaintiffs' adjustments on reply limiting their class period through the end of January 2015, the operative proposed class that Plaintiffs now seek to certify consists of the following:

> All persons who, in Arizona, Nevada, North Carolina, New Mexico, Maine, Minnesota, Michigan, South Dakota, Utah, California, Iowa, North Dakota, and West Virginia, purchased a filled propane exchange tank or paid to exchange their already-purchased propane exchange tank, and whose tank was provided by AmeriGas between December 1, 2009, and January 31, 2015, or by Blue Rhino between October 14, 2011, and January 31, 2015.

( Doc. # 476 at p. 5, Doc. # 540, p.10 n.19; Doc. # 540-1 p. 9 ¶ 36 & n.10).

On September 23, 2021, the Court held a lengthy hearing on Plaintiffs' motion for class certification. (Doc. # 602). Both Plaintiffs' expert, Professor Ackerberg, and Ferrellgas's expert, Professor Murphy, were present at the hearing.

---

[5]    After moving for class certification, Plaintiffs requested additional discovery from Ferrellgas relating solely to post-2015 damages. The Court concluded that Plaintiffs' belated discovery request was foreclosed by the Eighth Circuit's prior decision in *In re Pre-Filled Propane Tank Antitrust Litigation*, 893 F.3d 1047 (8th Cir. 2018). (*See* Doc. # 547, pp. 11–12).

## II.     LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citations and quotation marks omitted). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). "No class action may be certified unless the party seeking certification 'affirmatively demonstrate[s] his compliance with Rule 23.'" *In re State Farm Fire & Cas. Company*, 872 F.3d 567, 572 (8th Cir. 2017) (quoting *Comcast*, 569 U.S. at 33). "Rule [23] imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

"To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2010) (citations and internal quotation marks omitted). "Under Rule 23(a), a district court may certify a class only if it is satisfied, after a rigorous analysis, that the four threshold requirements are met: numerosity of plaintiffs, commonality of legal or factual questions, typicality of the named plaintiff's claims or defenses, and adequacy of representation by class counsel." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016) (citations and internal quotation marks omitted).

Plaintiffs here seek to certify a Rule 23(b)(3) class. "For certification under Rule 23(b)(3), the party must show that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Hudock v. LG Electronics U.S.A., Inc.*, --- F.4th ----, 2021 WL 4029769, at *1 (8th Cir. Aug. 25, 2021) (quoting *Comcast*, 569 U.S. at 34). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to

7

generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "What matters to class certification … is not the raising of common 'questions'—even in droves— but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quotation marks omitted). Predominance is lacking in circumstances where a plaintiff's common proof of impact fails to show that all or nearly all class members were in fact injured. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018) (if there are class members who "in fact suffered no injury," the "need to identify those individuals will predominate"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (similar).

In an antitrust case such as this one, the issue of antitrust "impact often is critically important for the purposes of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *In re Modafil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 204, 211 (3d Cir. 2008) (same). "A plaintiff seeking treble damages under … § 4 of the Clayton Act must establish an antitrust violation (here, the alleged conspiracy to fix prices) and the fact of damage or injury, i.e., impact." *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005). "[P]roof of conspiracy is not proof of common injury." *Id.* at 569. Plaintiffs must do more than present "common evidence that defendants colluded to raise [prices]"; they "must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy. Otherwise, individual trials are necessary to establish whether a particular [plaintiff] suffered harm from the [conspiracy]." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (same); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir.

2008) ("In antitrust class actions, common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof.").

With respect to whether Plaintiffs have satisfied their burdens under Rule 23(a) and (b)(3), the law is now clear that district courts must rigorously scrutinize the evidence and proof offered by Plaintiffs in support of class certification, and must find, by a preponderance of the evidence, that Rule 23's requirements are met. *See Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 551 (W.D. Mo. 2017) ("The preponderance of the evidence standard applies to evidence proffered to establish the requirements of Rule 23."); *see also Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015); *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012). Following the Supreme Court's decisions in *Wal-Mart* and *Comcast*, "[i]t is now indisputably the role of the district court to scrutinize the evidence before granting certification, even when doing so 'requires inquiry into the merits of the claim." *Rail Freight*, 725 F.3d at 253 (D.C. Cir. 2013) (quoting *Comcast*, 569 U.S. at 28); *see also Wal-Mart*, 564 U.S. at 351–52.

As for the kind of economic evidence offered by Plaintiffs, the Court must scrutinize it rigorously to ensure that it is capable of demonstrating impact on a class-wide basis: "[i]t is now clear … that Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it." *Rail Freight*, 725 F.3d at 255; *see also Lamictal*, 957 F.3d at 193 (holding that a district court abused its discretion in refusing to "address [plaintiff's] multi-leveled microeconomic analysis" in determining whether predominance under Rule 23(b)(3) was satisfied). Practically, this standard "requires district courts to closely scrutinize factual evidence and expert reports that demonstrate that impact can be proven on a classwide basis"; the Court "must determine not only the admissibility of expert evidence that forms the basis of the methodology that demonstrates [predominance]," but also "whether that expert evidence is

persuasive, which may require the Court to resolve methodological disputes." *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1186–87 (N.D. Cal. 2013); *see also In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 201 (E.D. Pa. 2016) ("[The Court is] required to weigh [the plaintiff's expert's] analysis … and determine whether it supports a finding that plaintiffs' theory of impact is susceptible to common proof a trial through available evidence common to the class."); *In re Photochromic Lens Antitrust Litig.*, No. 8:10-CV-00984-T-27EA, 2014 WL 1338605, at *25 (M.D. Fla. Apr. 3, 2014) (rejecting plaintiffs' contention that a magistrate judge applied "an unnecessarily strict standard by critiquing [their expert's] choices in structuring [his] methodology [for demonstrating common impact] and regressions" as "inconsistent with recent class certification jurisprudence").

The Supreme Court has also made clear that whether representative evidence offered by a plaintiff can be used to "establish classwide liability will depend on the purpose for which the sample is being introduced and the underlying cause of action." *Tyson*, 577 U.S. at 460. Because class certification requires that "each member [of the proposed class] have standing and show injury in fact," *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013), representative or aggregate evidence fails Rule 23 if it masks individualized issues or predicts injury where none otherwise exists. *See In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 159 (E.D. Pa. 2015) ("The case law understandably allows for averages and aggregations, but only if the court is convinced that the averages and aggregations are not masking individualized issues that are likely to predominate."); *Rail Freight*, 725 F.3d at 252 ("[A] methodology [that] detects injury where none could exist … shred[s] the plaintiffs' case for certification.").

And, because the Rules Enabling Act precludes Rule 23 from being applied to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), the Supreme Court has rejected a "Trial by Formula" approach to certification, explaining that "a class cannot be certified on the

premise that [the defendant] will not be entitled to litigate its statutory defense to individual claims." *Wal-Mart*, 564 U.S. at 367. Accordingly, the Supreme Court has made clear representative evidence or a "sample relied upon [by Plaintiffs] is a permissible method of proving classwide liability" only if "each class member could have relied upon that sample to *establish liability* if he or she had brought an individual action." *Tyson*, 577 U.S. at 455 (emphasis added); *see id.* at 458 (explaining that the "underlying question" in determining the permissibility of representative evidence is "whether the sample at issue could have been used to establish liability in an individual action," and that the sample in *Wal-Mart* failed because it could not meet this test). It is not enough, therefore, for the representative evidence to simply be *admissible* in the individual proceeding. Rather, such evidence must on its own be "sufficient to sustain a jury finding … if it were introduced in each [] individual action." *Id.* at 459; *Tyson,* 577 U.S. at 456–57 (noting that reliance on representative evidence "did not deprive petitioner of its ability to litigate individual defenses" only because "there were no alternative means for the employees to establish their hours worked," and thus liability).

## III. ANALYSIS

Plaintiffs have taken on the burden of trying to demonstrate, through common proof, that an alleged conspiracy between Defendants to reduce the fill levels of their propane exchange tanks in 2008 resulted in (i) an overcharge (an unlawfully inflated price per gallon) paid by all or nearly all of Defendants' thousands of retail customers that (ii) was subsequently passed on to all or nearly all of the end consumers who purchased propane exchange tanks from those retail customers in the 13 remaining class states. Plaintiffs claim that the putative class suffered common impact and damages in the form of inflated prices on AmeriGas and Blue Rhino branded propane exchange tanks stemming from the 2008 fill reduction on purchases throughout a class period that ends in January, 2015. Ferrellgas's challenge to Plaintiffs' motion for class certification is one directed at

their ability to satisfy the predominance requirement under Rule 23(b)(3), the failure of which alone suffices to defeat class certification. The Court's analysis therefore focuses on whether Plaintiffs' have met their burden of establishing predominance.

As a putative class of indirect purchasers, Plaintiffs have a two-part burden in establishing predominance. They must first demonstrate a common impact—in the form of an overcharge—incurred by all or nearly all retailers who directly purchased AmeriGas and Blue Rhino propane exchange tanks throughout the class period. Plaintiffs must then demonstrate that this impact—those overcharges—were passed on by the retailers to all or nearly all of the end customers who purchased AmeriGas and Blue Rhino propane exchange tanks. *See In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 682 (S.D. Fla. 2012) (IPPs "have a double burden … [of] first prov[ing] common impact on direct purchasers who bought … from the Defendants, and then show[ing[ that impact was passed through to the indirect purchaser class."); *Somers v. Apple Inc.*, 258 F.R.D. 354, 358 (N.D. Cal. 2009) ("Recovery in an indirect purchaser case under state law requires a demonstration that a defendant 'overcharged [its] direct purchasers for [the product at issue] and that those direct purchasers passed on the overcharge to [the] plaintiffs." (quoting *In re Graphics Proceeding Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008)); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016) (same). The failure to satisfy either element fails the predominance requirement.

As the Court explains below, Plaintiffs and their expert have failed to carry their burden of demonstrating that class-wide impact and damages can be established with common proof, as is required under Rule 23(b)(3). The Court's analysis proceeds in three parts. First, the Court summarizes the relevant evidence bearing on the class certification issues. Second, the Court analyzes Plaintiffs' proffered common proof with respect to overcharge to retailers. Third, the Court analyzes Plaintiffs' proffered common proof that overcharges were passed through by

retailers to plaintiffs resulting in class-wide overcharges.

## A. Overview of the Evidence

### 1. Defendants Sell to Thousands of Diverse Retail Customers

Throughout the class period, AmeriGas and Ferrellgas sold exchange and spare tanks to thousands of individual retail customers for resale to end customers. For example, in 2008, Ferrellgas sold tanks to over 45,000 retail locations in the U.S., with over 12,000 of them located in the 13 remaining class states. (*See* Doc. # 494-46, p. 5 ¶ 15). Over time, the number of retailers increased; in 2017, Ferrellgas sold propane tanks to over 50,000 different retail locations with over 13,000 of them in the 13 class states. (*Id.*).

Defendants' retail customers also varied substantially in type, size, location and volumes of tanks purchased. For instance, Ferrellgas's retail customers include national big-box stores (e.g., Walmart, Sears), home centers (e.g., Lowe's), grocery stores (e.g., Delhaize, Safeway), drug stores (e.g., Walgreens), fuel centers (e.g., Valero), convenience stores (e.g., 7-Eleven), national and local hardware stores (e.g., Ace Hardware and thousands of local stores), and small mom-and-pop shops. (*Id.* at pp. 4-5 ¶ 13).

## B. Overcharge

The first step of Plaintiffs' burden to establish predominance is showing, through common proof, that all or nearly all of the thousands of AmeriGas and Ferrellgas direct retailer customers suffered impact—via unlawful overcharges—on the propane tanks that those retailers purchased from AmeriGas and Ferrellgas for resale to the proposed class members. Aside from disputed allegations regarding a one-time fill-level reduction in 2008, Plaintiffs do not proffer any evidence or mechanism for how pricing throughout the entire class period was subject to ongoing collusion. As their expert, Professor Ackerberg, admitted, he has not seen evidence of pricing coordination throughout the class period. (Doc. # 494-3, 44:10-15). Plaintiffs' theory, therefore, is that an

13

inflated price effect on AmeriGas and Blue Rhino propane exchange and spare tanks continued unimpeded and market-wide since the 2008 fill-level change despite: (i) divergent and individually negotiated prices for exchange and spare tanks paid by AmeriGas's and Ferrellgas's retail customers throughout the class period, (ii) the absence of any evidence of communications with respect to pricing between Defendants during the class period, and (iii) the fact that the proposed class periods extend years after the 2008 fill-level adjustment, throughout which time Defendants have been continuously subject to a government investigation and class action lawsuits.

As noted above, Plaintiffs rely on the economic evidence offered by Professor Ackerberg to establish a classwide overcharge. Professor Ackerberg cites to market characteristics, including that propane is a commodity product and that AmeriGas and Ferrellgas are two large suppliers with substantial market share, and opines that common evidence of classwide injury is shown through his overcharge regression, which demonstrates that all or nearly all of AmeriGas's and Ferrellgas's retailer customers incurred a positive and statistically significant overcharge. (*See e.g.* Doc. # 476-1, p. 17 ¶ 43, p. 23 ¶ 63). Professor Ackerberg's regression model combined the revenues and gallons of all retailers in a given month to compute a singular weighted "average" measure of revenues per gallon. (*Id.* at p. 19 ¶¶ 49-50, p. 21 ¶ 57, p. 26 ¶ 64, p. 56; Doc. # 540-1, p. 63). Professor Ackerberg then purported to control for all factors that impact pricing—utilizing just three types of control variables (contemporary costs, seasonality differences, and two catch-all time trend variables for any unobserved factors that impact price over time)—and measured an average impact of the fill-level reduction across Defendants' sales transactions. (Doc. # 476-1, pp. 26-27 ¶¶ 73-80). The result of Professor Ackerberg's regression model consists of four average overcharge estimates—one each for AmeriGas and Ferrellgas's spares and exchange tanks. (Doc. # 540-1, pp. 48, 63). Professor Ackerberg and Plaintiffs contend that, while these average overcharge amounts measured by his regression are not reflective of actual overcharge amounts

14

incurred by any one retailer, they are adequate common proof that all retailers in fact paid a supracompetitive overcharge during the class period. (Doc. # 540, pp. 5-8).

In response, Ferrellgas claims that Professor Ackerberg's regression model is flawed by design and cannot show classwide impact. (*See generally* Docs. ## 494, 589). Ferrellgas argues that, even accepting Professor Ackerberg's regression model, which pools all data across all customers to estimate an "average" overcharge, the model masks the pricing variation that exists in the market and therefore is a methodology that is designed to assume, rather than to assess, the "common impact" that Plaintiffs have the burden of showing at class certification. (Doc. # 494, pp. 14-19; Doc. # 589, pp. 6, 8-10). Professor Murphy ran a series of sub-regressions that disaggregate Professor Ackerberg's model to test for the existence of any measured overcharge for individual retailers by applying Professor Ackerberg's model separately for AmeriGas's and Ferrellgas's ten largest retailers. (Doc. # 494-1, pp. 65-66 ¶¶ 127-130; Doc. # 589-1, pp. 4-6 ¶¶ 8-11). Such disaggregation is a common economic method for testing whether an aggregated overcharge model like that offered by Professor Ackerberg is in fact capable of demonstrating that all retailers were impacted. (*See* Doc. # 494-1, pp. 65-66 ¶¶ 127-130). The results of Murphy's disaggregation demonstrate that significant proportions (over 30%) of the at-issue class sales did not exhibit an overcharge, even though Professor Ackerberg's application of that same model on "aggregated" data otherwise indicates that all of those sales were subject to an overcharge. (Doc. # 589-1, pp. 4-6 ¶¶ 8-11).

Ferrellgas argues that Professor Ackerberg's regression exhibited another fundamental problem: it relies on two sets of variables that measure the passage of time, but Professor Ackerberg arbitrarily interprets one set as measuring the effect of the alleged conspiracy and the other as capturing the effect of all other "unobserved demand or cost shifters" that impact pricing. (Doc. # 589, pp. 12-13) (citing Doc. # 494-1, pp. 73-74 ¶¶ 157-159). Ferrellgas contends that the

unreliability of Professor Ackerberg's regression is confirmed by the fact that his predicted overcharges only (and illogically) *increase* after Professor Ackerberg purportedly addressed the analytical and design flaws that Professor Murphy identified. (Doc. # 589, pp. 12-13).

Plaintiffs insist that the Court need not weigh Professor Ackerberg's economic evidence. (Doc. # 476, p. 17). That is incorrect. The law requires the Court to rigorously scrutinize Plaintiffs' proffered evidence in support of class certification, and to resolve contested issues and economic evidence to make findings as to whether Plaintiffs have met their burden of demonstrating Rule 23's requirements by a preponderance of the evidence. *See, e.g.*, *Cope*, 319 F.R.D. at 551; *Lamictal*, 957 F.3d at 191. Accordingly, the Court engages in a rigorous analysis of Plaintiffs' proffered common proof and Ferrellgas's expert evidence. The Court finds that Plaintiffs have not satisfied their burden of establishing a common overcharge.

### 1. Professor Ackerberg's Use of Averaging and Aggregated Data Masks Variation and Skews the Evidentiary Record

By pooling the revenues and gallons of all retailers in a given month and estimating an "average" overcharge, Professor Ackerberg's overcharge regression masks unequivocal record evidence and data that wholesale prices were regularly negotiated, individually set, and highly dispersed among AmeriGas' and Ferrellgas's individual retail customers. Professor Ackerberg admits that his aggregated regression model cannot account for retailer differences that impact pricing, such as size, type, purchase volume, negotiating leverage, proximity to distribution centers, localized competition, or any other difference among retailers. (*See* Doc. # 494-3, 72:10-76:20). These limitations are problematic because they reflect that Professor Ackerberg's average overcharge models are concealing record evidence of individualized issues.

An example of this involves one of Defendants' major retail customers—Walmart. The record indicates that shortly after the fill level change in 2008, Walmart sought to obtain—and received—pricing concessions from AmeriGas and Ferrellgas beginning in 2009. (Doc. # 494-1,

16

p. 93 ¶ 207; Doc. # 494-28 (Ferrellgas offering to reduce pricing on exchange and spare tanks); Doc. # 494-29, 98:23-99:12). The Walmart buyer responsible for negotiating and purchasing propane exchange tanks testified those reductions constituted the cost concession Walmart wanted at that time. (*See* Doc. # 494-29, 98:23-99:12). Later in 2009, Walmart again negotiated with its suppliers for further cost reductions, which led Ferrellgas to offer another price reduction in January 2010. (*See* Doc. # 494-30). By pooling Defendants' pricing and sales to Walmart with that of all other retail customers, Professor Ackerberg's overcharge regressions mask this evidence of Walmart's individual negotiating leverage and the resulting individualized prices paid by Walmart.

Individualized evidence bearing on whether retail customers in fact paid an overcharge is not limited to just large buyers. There is also evidence in the record that Ferrellgas made cost concessions in May 2009 to hundreds of its independent retailers in California (one of the 13 class states), because Ferrellgas wanted to "stop the rising number of losses we have experienced in California" given "a very competitive environment" and other suppliers' efforts to "steal" Blue Rhino customers. (*See* Doc. # 494-27). Once again, Professor Ackerberg admits that his regression is "not able to isolate regional competition" impacts on pricing. (*See* Doc. # 494-3, 245:11–12). By using averages and estimating an average overcharge for all of Defendant's retail customers, Professor Ackerberg's regression masks such individualized evidence.

Overcharge models that rely on averaging of this sort can be problematic because, by design, they conceal variation in pricing and other individualized issues that may predominate. *See* ABA Section of Antitrust Law, Econometrics: Legal, Practical, & Technical Issues § 13.B.1.c.2 (2d ed. 2014) ("[A]verages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact."). That is demonstrated here by comparing the results of Professor Ackerberg's average overcharge

17

regression with the actual, individualized evidence in the record. Courts accordingly have held that markets characterized by individualized pricing negotiations are generally incompatible with common proof of impact. In *Blades v. Monsanto*, 400 F.3d 562, 572 (8th Cir. 2005), the Eighth Circuit held that the plaintiffs' use of average seed prices to demonstrate class-wide impact in the form of supracompetitive seed prices due to a genetically modified seed price-fixing conspiracy failed to satisfy predominance. Because the "market for seeds [was] highly individualized," and the prices for genetically modified seeds "varied widely," the use of an average inflated price was not adequate common evidence "to show inflation through the whole range of [seed] list prices." *Id.* at 572, 575. Similarly, in *In re Lamictal Direct Purchaser Antitrust Litigation*, 957 F.3d 184 (3d Cir. 2020), the plaintiffs' reliance on average prices could not show class-wide impact in the form of inflated prices for the drug lamotrigine. Given that the lamotrigine "market [was] characterized by individual negotiations and a discounted-brand competition strategy," the Third Circuit vacated the district court's decision to certify the class and remanded the case for a more rigorous analysis of whether the use of averages was masking otherwise individualized injury. *See id.* at 188, 192–94. "Numerous [other] courts have rejected the use of average price differentials to show evidence of antitrust impact that is common to the class." *In re Pharmacy Benefit Mgrs. Antitrust Litig.*, No. CV 03-4730, 2017 WL 275398, at *21 (E.D. Pa. Jan. 18, 2017) (collecting cases).

Here, Professor Ackerberg's aggregated overcharge regression suffers from a similar problem: it does not employ common or class-wide evidence capable of demonstrating that any given retailer was overcharged. Nor does it account for the undisputed and highly individualized issues with respect to retailer pricing. Instead, the regression model, designed to arrive at a single "average" overcharge that Plaintiffs contend shows class-wide injury, conceals the significant and undisputed variation in pricing that exists among Defendant's retail customers. That is not a way

18

to solve for individualized issues that predominate with respect to an overcharge. Rather, it is merely a proposal to disregard them, akin to the impermissible methodologies that various courts have rejected as insufficient to carry Plaintiffs' burden under Rule 23(b)(3).

### 2. Professor Ackerberg's Use of Averaging and Aggregated Data Covers Up the Existence of Numerous Uninjured Class Members

Professor Ackerberg contends that the actual, individually negotiated wholesale prices charged to Walmart—data that is available in the case and part of the record—are less reliable for measuring an overcharge to Walmart compared to pooling and averaging the wholesale prices paid by *all* of Ferrellgas' or AmeriGas's retailer customers, as he does with his average overcharge regression. (Doc. # 540-1, p. 20 ¶ 79). On its face, this argument does not make sense. Given the undisputed evidence of dispersed and varied pricing in this industry, it is questionable that Professor Ackerberg did not study whether his regression model would predict an overcharge for even the largest individual retailers whose purchases comprise significant portions of the class.

Furthermore, Professor Ackerberg's contention regarding statistical noise can be tested, yet it is something he did not do. Professor Murphy, however, tested whether applying Professor Ackerberg's own regressions to disaggregated data for the top ten retailers would introduce statistical noise, and confirmed that it did not. (Doc. # 563-2 pp. 9-10 ¶ 18). Such testing is a common economic technique. (*See id.* ¶¶ 18-19 & n.21). Professor Ackerberg's unsupported suggestion that pricing at non-Walmart stores offers a better estimate of what Walmart was overcharged compared to what is reflected in Walmart's own data is illogical.

Plaintiffs seek to undermine the disaggregated results of Professor Ackerberg's own regression by downplaying the importance of $p$-values, which they claim are "arbitrary." (Doc. # 540, p. 8). $P$-values are an important statistic for understanding whether the results of a regression are reliable evidence of impact. (Doc. # 563-2, pp. 13-14 ¶ 27 & n. 28, 33). They essentially estimate the risk of false positives. (*Id*.). The point estimate for Home Depot's purchases of

19

AmeriGas exchange tanks (which account for approximately 17.4% of all class sales) is illustrative. That point estimate shows a slightly positive overcharge (of $0.02, much lower than the estimate of $0.31 produced by Professor Ackerberg's aggregation of the data) and the associated $p$-value is 0.82, meaning that there is an 82% probability that Professor Ackerberg's regression would estimate an overcharge of $0.02 or larger even if there was in fact no overcharge at all. (*Id.* at p. 6 ¶ 9 & n.10). Such a high percentage, as reflected in the $p$-value, means that the regression result is not reliable economic evidence of whether Home Depot paid an overcharge on its purchases of AmeriGas propane exchange tanks. (*Id.*). Plaintiffs' contention that this Court can simply overlook the significance of a $p$-value, and what it reflects regarding the reliability of a regression's results as proof of impact, is without merit.

There is also no basis for finding $p$-values as high as 0.29 (Ace Hardware exchanges), 0.39 (Home Depot spares), and 0.82 (Home Depot exchanges) to be statistically significant, and Professor Ackerberg's attempt to characterize these results as evidence of an overcharge is inconsistent with his published work outside of litigation and contradicted by the various publications that he references. (*See* Doc. # 589 p. 12 n.5; Doc. # 589-1, p. 11 ¶ 24 & n.25). Professor Ackerberg's willingness to now accept $p$-values at unreliably high values is not credible given the contrary positions regarding $p$-values that he takes in his original class certification declaration and his peer-reviewed work. Plaintiffs cannot avoid the empirical and substantive evidence confirming that Professor Ackerberg's use of a pooled regression to calculate a classwide average overcharge is impermissibly masking individualized differences among class members that bear directly on whether class members suffered any injury. That is not sufficient evidence to carry Plaintiffs' burden of establishing predominance under Rule 23(b)(3).

### 3. Professor Ackerberg's Overcharge Model Suffers from Other Design Flaws That Render it Unreliable and Incapable of Satisfying Plaintiffs' Rule 23 Burden

A reliable regression isolates the non-collusive factors that affect price to determine

whether, and to what extent, differences in prices between a benchmark period and the at-issue period may be attributed to alleged collusion. (Doc. # 494-1, p. 61 ¶ 116 & n. 145, p. 69, ¶ 141). Following a rigorous analysis, the Court is unconvinced that Professor Ackerberg's regression accomplishes this goal. The indicator (or "dummy") variables used for the alleged conduct periods, which Professor Ackerberg interprets as capturing solely the effect of the alleged collusive conduct, in fact capture the effects of *other* factors that influence price, such as undisputed increases in demand over time and inflation. (*Id*.).

As stated in a popular econometrics textbook, "[t]he general linear multiple regression model is a particular specification of some economic process in which the values of a dependent variable (or regressand) are determined by several explanatory variables (or regressors)." (Doc. # 494-3, p. 61 ¶ 116) (citing Mirer, Thad W., *Economic Statistics and Econometrics*, Third Edition). In Professor Ackerberg's regression model, the dependent variable is price per gallon, and he claims his regression can evaluate price per gallon as a function of explanatory variables that purportedly represent "costs, demand, and the nature of competition." (Doc. # 476-1, p. 26, ¶¶ 73–74). However, given the individualized prices negotiated by Ferrellgas's and AmeriGas's tens of thousands of customers, Professor Ackerberg's overcharge regression model is notably bare with respect to variables that purport to control for all factors impacting price other than the alleged conduct. (*Id*.). The regression contains only variables that control for costs, the seasons, and "time trend," variables that supposedly capture every other "unobserved" factor that impact pricing to all customers, across all states, and over the multi-year class period. *Id*. Professor Ackerberg attributes any changes to the "predicted" prices in the conduct period to a dummy (or "conspiracy") variable that his regression turns on at a specified time period corresponding with the beginning of the alleged class period. *Id*.

Further, Professor Ackerberg designs his dummy variable to turn on beginning on specific

dates that are dictated by the settlement releases from *Propane I* (*i.e.*, December 2009 for AmeriGas and October 2011 for Ferrellgas). (*Id*. at pp. 26-27 ¶ 76). So while he purports to study the price effects of the 2008 fill reduction, which Plaintiffs claim was the result of collusion, his regression is designed in such a way as to only estimate for the existence of impact beginning with the start of a class period that is set entirely by the *Propane I* settlement release dates. (*Id*.). However, even as a matter of sheer logic, if the effect of the 2008 fill-level reduction was going to dissipate, it would dissipate gradually over time. It wouldn't just disappear suddenly on one date. In particular, it wouldn't disappear on the release date magically.

## C. Pass Through

Because Plaintiffs' common proof with respect to overcharge fails, that itself suffices to defeat predominance. The Court nevertheless addresses the issue of pass-through. As their common proof of class-wide pass-through, Plaintiffs offered pass-through studies conducted by Professor Ackerberg. (*See e.g.* Doc. # 476-1, pp. 28-29, ¶¶ 83-91). His studies were limited to just three of AmeriGas's and Ferrellgas's thousands of individual retail customers—Walmart, UNFI, and Dollar General. (*Id*.). For each of these retailers, Professor Ackerberg compared the average wholesale prices paid and retail prices charged for AmeriGas and Blue Rhino propane exchange tanks before and after the 2008 fill reduction. (*Id*. at p. 28 ¶ 83). Based on those calculations, he concludes that all of AmeriGas's and Ferrellgas's thousands of retail customers passed on an overcharge at a "conservative" rate of 100%. (*Id*. at p. 30, ¶ 96). Further, although the class period ends in January, 2015, Professor Ackerberg's pass-through studies end in 2012—nearly three years before the end of the class period, because, as he himself acknowledges, "the empirical effect of Defendants' coordinated fill reduction is less likely to be captured farther away from the event date." (*Id*. at p. 29 ¶ 90).

After careful consideration, the Court concludes that Professor Ackerberg's pass through

studies cannot satisfy Rule 23(b)(3)'s predominance requirement. As an initial matter, the Court has serious doubt over whether Professor Ackerberg's analysis can reliably isolate and measure the pertinent inquiry: whether (and the extent to which) a wholesale cost *change* causes a *change* in retail price. His studies just employ a formula to capture whether there was a change in the retail price per gallon relative to a change in wholesale price per gallon for the propane exchange tanks purchased and resold by three retailers. That does not actually measure whether a cost change *due to an overcharge* as opposed to some other reason was passed-on by these retailers to their customers.

Setting that aside, the fundamental problem with Professor Ackerberg's pass-through analysis is that its reliance on averages and its miniscule sampling of retailer data cannot reliably account for the variation in wholesale and retail prices across AmeriGas's and Ferrellgas's thousands of retailer customers. The evidence is undisputed that those retailer customers paid individually negotiated wholesale prices and then resold AmeriGas and Blue Rhino propane exchange tanks at individually-set retail prices. Professor Ackerberg's pass-through studies do not account for any of this variation, and he even admitted that his pass-through studies "cannot target individual cases," since his "conclusions are about averages." (Doc. # 494-3, 349:3–351:6).

Courts have consistently rejected such pass-through methodologies because their use of averaging and sampling to assume a singular pass-through rate by all intermediaries, without underlying evidentiary support, can mask individualized questions that otherwise predominate. For example, in *In re Processed Eggs Products Antitrust Litigation*, 312 F.R.D. 124, 160 (E.D. Pa. 2015), class certification was denied because the indirect purchaser plaintiff's "pass-through model improperly assume[d], without adequate support, that because one retailer passed through the overcharge at a certain rate averaged across its stores, all retailers *nationwide* shared that overcharge rate or, at least, passed along some positive overcharge." (Emphasis in original).

While "[t]he case law understandably allows for averages and aggregations," it must be "convinced that the averages and aggregations are not masking individualized issues that are likely to predominate"—a test which plaintiffs' expert's pass-through model failed. *Id.*; *see also In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164–65 (N.D. Cal. 2001) (denying certification where indirect purchasers' expert's "method assume[d] that there is a single pass-through rate for all direct and indirect resellers, yet … point to nothing in the record that suggest that such an assumption is valid"); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *12–13 (N.D. Cal. June 9, 2010) (finding indirect purchaser plaintiffs failed to satisfy Rule 23(b)(3) where their expert's regression "simply assume[d] that the pass through rates for all personal media players are the same and are equal to the average pass through rate for all products").

Professor Ackerberg's pass-through studies suffer from the same flaw. Based on a study of sales to only three retailers that ends three years before the end of the class period (and therefore comprise less than 10% of sales to the putative class), Professor Ackerberg makes the inferential leap that *all* of AmeriGas's and Ferrellgas's thousands of retailers similarly passed on an overcharge, and at the same rate. The only evidence in the record, however, casts doubt on whether there was any pass-through at all. For example, Walmart—one of the three retailers that Professor Ackerberg did study—indicated that it would not always pass on price increases or decreases from a supplier to its customers. (Doc. # 494-31, 130:18–132:5). And although Ferrellgas lowered its wholesale prices for propane exchange tanks sold to Walmart between 2009 and 2010, Walmart kept its retail prices for those tanks the *same* throughout that period, further undercutting any possible conclusion that Wal-Mart could have passed on any overcharges.[6] (*Id*. at 155:6-19; Doc.

---

# 494-1, p. 85 ¶ 202). Evidence from another retailer, Fry's, indicated that it maintained the same retail price for AmeriGas propane exchange tanks for a long time, despite changes in the cost. (Doc. # 589-3, p. 8-15 (Exhibit 2)). There is no other retailer evidence in the record.[7]

Professor Ackerberg's pass-through studies not only fail to account for any of this evidence, but when weighed against the actual evidence in the record, are clearly masking this and other individualized issues relating to pass-through by employing a common, pass-through rate for all the thousands of Ferrellgas's and AmeriGas's retailer customers. This cannot satisfy Rule 23(b)(3)'s predominance standard. *See In re Processed Eggs Prods. Antitrust Litig.*, 312 F.R.D. at 160.

The final infirmity that defeats predominance is the fact that Professor Ackerberg's pass-through studies are limited to the end of 2012, when the alleged class period here goes through the end of January, 2015. A pass-through analysis that purports to estimate class-wide impact but falls short of the alleged class period by nearly three years cannot satisfy Plaintiffs' burden under Rule 23(b)(3). Indeed, Professor Ackerberg admitted as much in his own report—that his pass-through analysis ends in 2012 because "the empirical effect of Defendants' coordinated fill reduction is less likely to be captured farther away from the event date" (Doc. # 476-1, p. 29 ¶ 90)—i.e., the 2008 fill reduction.[8] But that is precisely what Rule 23 requires Plaintiffs to show—that all or

---

[7] Plaintiffs on reply offered the opinion that "cost-plus" pricing is "prevalent" in the industry, such that "there is no reason to think that any overcharge would not be passed through," (Doc. # 540 at 11), but that is nothing more than conjecture, unsupported by any actual evidence in the record. It is not something that can be relied upon as common proof of class-wide pass-through. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (expert opinion is "useful as a guide to interpreting market facts, but it is not a substitute for them").

[8] Plaintiffs sought to undo this admitted limitation of Professor Ackerberg's pass-through studies by pointing to how Professor Ackerberg also analyzed data beyond 2012 for robustness. But the fact that Professor Ackerberg undertook such a robustness analysis and nevertheless concluded, based on his expertise, to limit his opinions and conclusions regarding pass-through on data only through 2012 just confirms that his studies cannot serve as proof of any impact beyond 2012.

25

nearly all of Defendants' retailer customers passed-on overcharges to the indirect purchaser plaintiffs throughout the class period. A set of pass-through studies for three retailers through the end of 2012 cannot satisfy Plaintiffs' burden of demonstrating class-wide pass-through for a class period that ends in January, 2015. Plaintiffs have not satisfied their burden of demonstrating that common issues predominate as to impact to the proposed indirect purchaser class.

## **CONCLUSION**

For the reasons set forth in this Order, and following this Court's rigorous analysis of Plaintiffs' proffered proof and expert analyses, the Court concludes that Plaintiffs have not met their burden of demonstrating that common issues will predominate as to their claims. Plaintiffs' motion for class certification is therefore DENIED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: November 9, 2021